*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-FM-112

IN RE WENDELL MACKLIN, APPELLEE;

DISTRICT OF COLUMBIA, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2019-MHE-002056)

(Hon. Jennifer A. Di Toro, Trial Judge)

(Argued May 26, 2022                    Decided December 22, 2022)

*Holly M. Johnson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time the brief was filed, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Ashwin P. Phatak*, Deputy Solicitor General, were on the brief, for appellant.

*Kelsey Townsend*, Public Defender Service, with whom *Samia Fam* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

Opinion for the court by *Associate Judge* MCLEESE.

Dissenting opinion by *Associate Judge* EASTERLY at page 29.

MCLEESE, *Associate Judge*: This case arises at the intersection of the Incompetent Defendants Criminal Commitment Act (IDCCA), D.C. Code § 24-531.01 et seq., and the Hospitalization of the Mentally Ill Act (also known as the Ervin Act), D.C. Code § 21-501 et seq. The trial court concluded that appellee Wendell Macklin was entitled to release under those acts. We reverse.

## I. Factual and Procedural Background

Mr. Macklin was arrested in September 2018 and subsequently charged with assault and attempted possession of a prohibited weapon (knife). A question arose about whether he was competent to stand trial, and extensive further proceedings ensued. During those proceedings, Mr. Macklin was ordered to St. Elizabeths Hospital for inpatient examination and treatment. Eventually, the trial court determined in September 2019 that Mr. Macklin was incompetent and unlikely to regain competence. That determination required that Mr. Macklin be either released or civilly committed. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); D.C. Code § 24-531.06(c)(4).

The District of Columbia indicated that it intended to file a petition to have Mr. Macklin civilly committed, and the trial court ordered Mr. Macklin held for

further treatment pending the filing of that petition. D.C. Code § 24-531.06(c)(4). The District of Columbia filed a petition for civil commitment, alleging that Mr. Macklin had been diagnosed with paranoid schizophrenia and was likely to injure himself or others if not civilly committed. The trial court initially ordered that Mr. Macklin receive inpatient treatment until the entry of a final order in the civil-commitment case. D.C. Code § 24-531.07(a)(2).

In March 2020, the Commission on Mental Health held a hearing in the civil-commitment case. At the hearing, the District of Columbia introduced evidence that Mr. Macklin's paranoid schizophrenia would likely lead to acts of aggression if Mr. Macklin were not civilly committed. The Commission issued a written order finding that Mr. Macklin was likely to injure himself if not committed and recommending inpatient commitment for one year. The Commission's order did not make a finding about the likelihood that Mr. Macklin would injure others if he was not civilly committed. The Commission's order also did not make an explicit finding as to whether inpatient commitment was the least restrictive alternative, although it noted testimony to that effect.

Proceedings in the civil-commitment case were delayed by the COVID-19 pandemic. In November 2020, the trial judge in the criminal case ordered that Mr.

Macklin be released in that case but detained pending a hearing on the civil-commitment petition. Mr. Macklin subsequently moved for release in the civil-commitment case, arguing that he could be detained in that case only until the date of the Commission hearing, which had already occurred. D.C. Code § 24-531.07(c)(1) (if trial court orders release in criminal case of defendant who has been committed to an inpatient treatment facility, "inpatient treatment facility may detain the person pending" Commission's hearing on civil-commitment petition). The trial court initially denied Mr. Macklin's motion, concluding that Mr. Macklin could be held under D.C. Code § 21-526(d)(1) (if Commission finds that person is mentally ill, person is likely to self-injure or injure others if not committed, and inpatient treatment is least restrictive alternative to prevent such injury, "detention for emergency observation and diagnosis may be continued" pending conclusion of civil-commitment proceeding). Mr. Macklin filed a motion to reconsider, arguing that § 21-526(d)(1) did not apply because Mr. Macklin had never been detained for "emergency observation and diagnosis" in the first place. The trial court granted reconsideration and ordered Mr. Macklin's release in the civil-commitment case.

## II. Mootness

In this appeal, the District of Columbia challenges the trial court's order releasing Mr. Macklin from inpatient treatment while the civil-commitment proceeding was pending. After this appeal was taken, the trial court entered a final order in the civil-commitment case, finding that Mr. Macklin was mentally ill and was likely to injure himself or others if not committed. The trial court ordered Mr. Macklin to undergo outpatient treatment for a year.

The parties agree that the final order in this case renders the current appeal moot. Both parties argue that this court should nevertheless decide the appeal, because the appeal presents an important and recurring issue of law and because the issue would otherwise tend to evade review. *See, e.g.*, *In re Barlow*, 634 A.2d 1246, 1249-50 (D.C. 1993) (deciding appeal that was technically moot, because of "short duration" of challenged action and because appeal involved "overarching issues important to the resolution of an entire class of future cases") (brackets and internal quotation marks omitted). We agree with the parties, and we therefore resolve the appeal on the merits.

### III.  Statutory Framework

### A.  Involuntary Civil Commitment under the Ervin Act

Involuntary civil-commitment proceedings are initiated by filing a petition with the Commission on Mental Health alleging that a person is mentally ill and therefore likely to self-injure or injure others if not committed.  D.C. Code § 21-541(a)(1).  The petition must be supported by a certificate to that effect from a physician or qualified psychologist.  *Id.*  After such a petition is filed, the Commission must promptly examine the person and hold a prompt hearing.  D.C. Code § 21-542(a).  The Commission then must promptly report to the trial court its conclusion as to whether the person is mentally ill and therefore likely to self-injure or injure others if not committed.  D.C. Code § 21-544.  The trial court thereafter must promptly hold a hearing or, if requested, a trial.  D.C. Code § 21-545.  If the person is not found to be both mentally ill and therefore likely to self-injure or injure others, the civil-commitment petition must be dismissed.  D.C. Code § 21-545(b)(1).  If the person is found to be mentally ill and therefore likely to self-injure or injure others if not committed, the court may order the person committed for a period of a year.  D.C. Code § 21-545(b)(2).  Such commitment can include hospitalization if

the court concludes that hospitalization "is the least restrictive alternative consistent with the best interests of the person and the public." *Id.*

## B. Emergency Involuntary Hospitalization under the Ervin Act

If there is reason to believe that immediate detention is necessary to prevent a mentally ill person from self-injury or injury to others, the person may be taken into custody without a warrant and transported to a hospital, and an application can be made to have the person admitted for "emergency observation and diagnosis." D.C. Code § 21-521. Such an application triggers a series of procedural protections. The hospital may admit the person as an inpatient only if a qualified person at the hospital concludes that the person is likely to self-injure or injure others unless immediately detained and that hospitalization is the least restrictive means of preventing such injury. D.C. Code § 21-522(a). The hospitalization may not last more than forty-eight hours unless the hospital files a petition with the court seeking an order to extend the hospitalization for a period of no more than seven days. D.C. Code § 21-523. Within twenty-four hours of receiving such a petition, the court must either approve the request or order the hospitalized person's release. D.C. Code § 21-524(a). In making that determination, the trial court must determine whether "probable cause exists to believe that [the] person is likely to [self-injure or injure]

others if not immediately detained." *In re Herman*, 619 A.2d 958, 959 (D.C. 1993) (en banc). If the hospitalized person requests a court hearing, the trial court must hold a "full evidentiary hearing" within twenty-four hours of the request. *In re Herman*, 619 A.2d at 964; D.C. Code § 21-525. At that hearing, the hospitalized person may contest the correctness of the trial court's determination under § 21-524. *In re Herman*, 619 A.2d at 964. If the trial court once again determines that there is probable cause to believe that the hospitalized person is likely to self-injure or injure others if not immediately detained, then the trial court may order that the person "continue to be hospitalized for emergency observation and diagnosis." *Id.* at 961.

The hospital also must examine the person within forty-eight hours of the trial court's order under § 21-524 and must immediately release the person if, then or at any time thereafter, the hospital determines that the person "is no longer mentally ill to the extent that the person is likely to [self-injure or injure] others if not presently detained." D.C. Code § 21-527(a)(1), (a)(2), (b)(1).

The period for emergency hospitalization can be extended for up to twenty-one days if a civil-commitment petition has been filed. D.C. Code § 21-526(c). If the Commission holds a hearing on the civil-commitment petition and finds that inpatient commitment is the least restrictive alternative to prevent self-injury or

injury to others, the "detention for emergency observation and diagnosis may be continued" pending the completion of the civil-commitment proceeding. D.C. Code § 21-526(d)(1). If the Commission finds that the person "is not mentally ill or if mentally ill, is not mentally ill to the extent that he is likely to [self-injure or injure] other persons if not committed, the Commission shall immediately order [the person's] release." D.C. Code § 21-544.

## C. Incompetent Criminal Defendants under the IDCCA

If the court finds that a criminal defendant is unlikely to regain competence, the court can order inpatient treatment for up to thirty days pending the filing of civil-commitment petition. D.C. Code § 24-531.06(c)(4). If a petition has been filed within that period, the trial court has two options. First, the trial court can order that inpatient treatment continue until a final order is issued in the civil-commitment case. D.C. Code § 24-531.07(a)(2). Second, the trial court can order the defendant's release in the criminal case. D.C. Code § 24-531.07(c)(1). If the trial court chooses the second option, the trial court must "remand the person to the inpatient treatment facility and the inpatient treatment facility may detain the person pending a hearing on the petition conducted pursuant to § 21-542." *Id.* As a reminder, § 21-542 governs the hearing before the Commission on a civil-commitment petition. A

defendant who has been detained under § 24-531.07(c)(1) has the right to demand a "probable cause hearing on the person's continued detention" "pursuant to § 21-525." D.C. Code § 24-531.07(c)(2). Such a hearing is held in the Family Court, which is the division of Superior Court that handles civil-commitment matters. *See* Super. Ct. Fam. R. (introductory note); Super. Ct. Ment. Health R. 1. The hearing must be held within twenty-four hours. D.C. Code § 24-531.07(c)(2).

## IV. Analysis

We decide issues of statutory interpretation de novo. *Roberts v. United States*, 216 A.3d 870, 876 (D.C. 2019). "We first look to see whether the statutory language at issue is plain and admits of no more than one meaning." *Id.* (internal quotation marks omitted). "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. Therefore, we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them." *Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc) (citation and internal quotation marks omitted). "We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. Statutory interpretation is a holistic endeavor." *Id.* (citation, ellipsis, and internal quotation marks omitted).

"We will give effect to the plain meaning of a statute when the language is unambiguous and does not produce an absurd result." *In re Z.M.*, 272 A.3d 1183, 1191 (D.C. 2022) (brackets and internal quotation marks omitted); *see District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006) ("A court may refuse to adhere strictly to the plain language of a statute in order to effectuate the legislative purpose as determined by a reading of the legislative history or by an examination of the statute as a whole.") (brackets and internal quotation marks omitted). "When interpreting statutes, we assume that the legislature acted logically and rationally and we avoid interpretations of statutes which lead to implausible results." *Wade v. United States*, 173 A.3d 87, 95 (D.C. 2017) (internal quotation marks omitted).

"[W]e consider statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation." *In re G.D.L.*, 223 A.3d 100, 104 (D.C. 2020). "We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent." *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019) (brackets and internal quotation marks omitted).

Applying these principles, we conclude that a defendant who has been found unlikely to regain competence and who has been released in the criminal case can

properly be detained pursuant to D.C. Code § 21-526(d) pending completion of the civil-commitment process. We acknowledge that Mr. Macklin's argument to the contrary finds considerable support in the wording of § 21-526(d). In sum, Mr. Macklin appears to argue the following: (1) § 21-526(d) authorizes "continued" "detention for emergency observation and diagnosis"; (2) detention for "emergency observation and diagnosis" occurs in the context of emergency hospitalization, *e.g.*, D.C. Code § 21-521; (3) the District of Columbia never sought to have Mr. Macklin hospitalized on an emergency basis; and thus (4) there was no detention for "emergency observation and diagnosis" to be continued. Rather, Mr. Macklin contends, continued detention under § 21-526(d) of a criminal defendant found unlikely to regain competence and released in the criminal case is permissible only if a petition for emergency hospitalization has been filed.

If the analysis were properly focused only on these provisions, Mr. Macklin's argument would seem quite persuasive. Mr. Macklin's argument finds further support from the principle that this court will "construe[] the [Ervin] Act narrowly when its application may result in the curtailment of any person's liberty." *In re Walker*, 856 A.2d 579, 588 (D.C. 2004) (internal quotation marks omitted). As we have explained, however, statutory interpretation is a holistic task, and we must also consider the language and structure of other provisions in the Ervin Act and the

IDCCA. In our view, this broader inquiry weighs heavily against Mr. Macklin's argument, for several reasons.

### A. Continued Detention pursuant to D.C. Code § 21-525

One important countervailing consideration is that other provisions of the Ervin Act and the IDCCA seem to contradict Mr. Macklin's theory. A defendant who has been found unlikely to regain competence and who has been detained pending a Commission hearing on a petition for civil commitment has the right to demand a prompt "probable cause hearing on the person's continued detention," "pursuant to § 21-525." D.C. Code § 24-531.07(c)(2). The purpose of a hearing held under § 21-525 is to determine whether the trial court's earlier ruling under § 21-524 was correct. *In re Herman*, 619 A.2d at 964. The issue for the trial court under § 21-524 is whether to grant "a petition for hospitalization of a person for emergency observation and diagnosis." D.C. Code § 21-524(a).

Under the logic of Mr. Macklin's argument, a trial court seemingly could not order "continued detention" under § 24-531.07(c)(2) unless the District of Columbia had already filed a petition for emergency involuntary hospitalization before the trial court rules. That is because § 24-531.07(c)(2) permits detention pursuant to § 21-

525, which in turn is directed at determining whether it was correct to grant "a petition for hospitalization of a person for emergency observation and diagnosis." If no such petition has been filed, then—on Mr. Macklin's theory—the trial court apparently would have no basis under § 24-531.07 to grant continued detention under § 21-525.

To the contrary, we think it clear that § 24-531.07(c)(2) was intended to grant the trial court authority to order continued detention without regard to whether the District of Columbia had already filed a petition for emergency involuntary hospitalization. Section 24-531.07(c)(2) is not limited by its terms to instances in which such a petition has already been filed. Rather, it authorizes a hearing, upon prompt request, any time a defendant has been remanded to an inpatient facility under § 24-531.07(c)(1). Moreover, as we have explained, to order continued detention under § 24-531.07(c)(2) the trial court must find that there is probable cause to believe that the defendant is likely to self-injure or injure others if not immediately detained. That is precisely the finding that authorizes continued detention of persons who have been involuntarily hospitalized on an emergency basis. *In re Herman*, 619 A.2d at 959.

Limiting the trial court's authority to order continued detention under § 24-531.07(c)(2) to cases in which a petition for emergency involuntary hospitalization has already been filed would lead to consequences that we view as unreasonable to the point of absurdity. The first issue is one of conflicting timelines. Emergency involuntary hospitalization begins with an application to have a person admitted to a hospital for purposes of emergency observation and diagnosis. D.C. Code § 21-521. If the person is admitted, the hospital has forty-eight hours to file a petition asking for continued detention for up to seven days. D.C. Code § 21-523. The court is then required to rule on that petition with twenty-four hours of receipt. D.C. Code § 21-524. If the person requests a hearing to challenge that ruling, the trial court is then required to hold a hearing with twenty-four hours. D.C. Code § 21-525.

That timeline, though compressed, is incompatible with the stricter deadline set by § 24-531.07(c)(2). That provision requires the trial court to hold a full evidentiary hearing pursuant to § 21-525 within twenty-four hours of a request, which request can be made immediately once the defendant is remanded to the hospital under § 24-531.07(c)(1). Thus, unless the District of Columbia happened to begin the process of emergency involuntary hospitalization some days before the trial court even released the defendant in the criminal case, § 24-531.07(c)(2) in Mr.

Macklin's view might require the trial court to hold a full evidentiary hearing to determine the correctness of a ruling that the trial court would not yet have made about whether to grant a petition for involuntary emergency hospitalization that the trial court had not yet even received.

The problem is not limited to timing conflicts. On Mr. Macklin's theory, the trial court apparently would have to hold two separate, substantively identical "full evidentiary hearings" on whether there was probable cause to believe that the defendant was likely to self-injure or injure others if not immediately detained, one hearing under § 24-531.07(c)(2) and one hearing under § 21-525. Depending on the timing of events, those two hearings might occur quite closely in time. We think it entirely implausible that the D.C. Council intended so unreasonable a result. *Cf.*, *e.g.*, *McWatt v. Mattax*, No. 03-13-00332-CV, 2015 WL 1285793, at *5 (Tex. App. Mar. 18, 2015) (stating that it would be absurd to construe statute to require duplicative hearings).

We draw two conclusions from the foregoing discussion. First, the IDCCA does not contemplate that the continued detention of defendants remanded to an inpatient facility under § 24-531.07(c) would turn on whether the process of emergency involuntary hospitalization has been started from the beginning. Rather,

the IDCCA authorizes continued detention of such defendants if the trial court has held an evidentiary hearing under § 24-531.07(c)(2) and has determined that there is probable cause to believe that the defendant was likely to self-injure or injure others if not immediately detained.

Second, there is an apparent drafting error in the way in which the IDCCA interacts with the Ervin Act. Although § 24-531.07(c)(2) contemplates continued detention of defendants remanded to an inpatient facility, without a need for the filing of a petition for emergency involuntary hospitalization, § 24-531.07(c)(2) does so by cross-reference to provisions—§ 21-524 and § 21-525—that by their terms seem to presuppose prior detention for emergency observation and diagnosis. For the reasons already stated (and other reasons we discuss *infra*), we conclude that this apparent drafting error does not require us to ignore the clear intent of the relevant provisions or to adopt an absurd construction of the interaction between the IDCCA and the Ervin Act. *See, e.g., Chickasaw Nation v. United States*, 534 U.S. 84, 91 (2001) ("[C]ommon sense suggests that the cross-reference is simply a drafting mistake."). We do not have a general authority to "rescue [the legislature] from its drafting errors, and to provide for what we might think is the preferred result." *Lamia v. U.S. Tr.*, 540 U.S. 526, 542 (2004) (ellipsis and internal quotation marks omitted). We do, however, have the authority, in extraordinary circumstances, to

disregard "obvious technical drafting errors."  *Niz-Chavez v. Garland*, 141 S. Ct. 1747, 1480 n.1 (2021).  We conclude that the present case is an appropriate occasion to exercise that authority.  *Cf. Gilmore v. United States*, 699 A.2d 1130, 1132-33 (D.C. 1997) (construing "subsection" to mean "section," thereby correcting "clerical error" in order to avoid absurdity and give effect to legislature's obvious intent).

The foregoing discussion has focused on the consequences of the hearing held under § 24-531.07(c)(2).  No such hearing was held in the present case, because Mr. Macklin choose not to avail himself of that procedural protection.  The issue in the present case is whether a defendant remanded to an inpatient facility under § 24-531.07(c)(1) can be held in the facility pending the resolution of civil-commitment proceedings on the basis of a finding by the Commission that inpatient commitment is the least restrictive alternative to prevent self-injury or injury to others.  D.C. Code § 21-526(d).  Essentially for the reasons already outlined, we conclude that it would be absurd to require the release of such a defendant unless a parallel process of emergency involuntary hospitalization had been initiated.  It is true that § 21-526(d) by its terms presupposes prior detention for emergency observation and diagnosis.  As we have already explained, however, we conclude that this presupposition reflects a drafting error that can and should appropriately be disregarded in order to avoid absurdity and give effect to clear legislative intent.

## B. Other Structural Considerations

Several other structural considerations support the conclusion that defendants who have been remanded to an inpatient facility under § 24-531.07(c)(1) can be detained pending completion of civil-commitment proceedings if the Commission finds that inpatient commitment is the least restrictive alternative to prevent self-injury or injury to others.

First, as previously noted, the trial court in the criminal case has two options after finding that a criminal defendant is unlikely to regain competence: to direct that inpatient treatment continue until a final order is issued in the civil-commitment proceeding, D.C. Code § 24-531.07(a)(2); or to remand the defendant to an inpatient facility pending the Committee hearing, D.C. Code § 24-531.07(c)(1). If the trial court picks the first option, the defendant is detained without receiving any of the procedural protections afforded to persons who are involuntarily hospitalized. (We note that Mr. Macklin has suggested that D.C. Code § 24-531.07(a)(2) may be unconstitutional; that issue is not before us and we express no opinion on the issue.) It would be quite strange if the second option were the diametric opposite: defendants who are remanded under § 24-531.07(c)(1) must be given not only all of the protections given to persons who are subject to emergency involuntary

hospitalization but also the additional specific protection provided in § 24-531.07(c). It is in our view far more reasonable to understand the second option, as we do, to provide some but not all of the protections given to those who are involuntarily hospitalized on an emergency basis.

Second, the IDCCA in one respect clearly does not provide defendants remanded under § 24-531.07(c) with all of the procedural protections provided to persons who are involuntarily hospitalized on an emergency basis. Specifically, the IDCCA permits such defendants to be held inpatient, without any further findings or procedural protections, at least until a Commission hearing is held. D.C. Code § 24-531.07(c)(1). That detention could last for some time, because there is no specific time line for holding that hearing, which instead must simply be held "promptly." D.C. Code § 21-542(a). It would be anomalous to permit detention without such protections for that period of time but then permit further detention only if defendants are given all of the protections provided to persons who are involuntarily hospitalized on an emergency basis, starting from the beginning with an application to be admitted to a hospital. It would be particularly anomalous to terminate the authority for detention at the point where the Commission makes a finding that supports continued detention, not release: that inpatient commitment is

the least restrictive alternative to prevent self-injury or injury to others.  D.C. Code § 21-526(d).

Finally, if the D.C. Council had intended that defendants remanded to an inpatient facility under § 24-531.07(c)(1) be provided with all of the protections afforded to those who are subject to emergency involuntary hospitalization, one would think the Council would have stated that directly, rather than leaving that conclusion to be divined from the presuppositions of provisions buried several cross-references in.  *Cf., e.g.*, *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1349 (2021) ("Congress does not hide elephants in mouseholes.") (ellipses and internal quotation marks omitted).

## C.  Legislative History

The legislative history of the bill that became the IDCCA does not appear to shed direct light on the issue before us.  *See Incompetent Defendants Criminal Commitment Act of 2004*, D.C. Council, Report on Bill 15-967 (Nov. 17, 2004).  We do note, however, that there is no mention in the Committee Report on that bill of the idea that emergency involuntary hospitalization would be necessary to permit

continued detention of defendants remanded under § 24-531.07(c)(1) to an inpatient facility pending a Commission hearing.

A year before the IDCCA was enacted, the D.C. Council enacted the Prevention of Premature Release of Mentally Incompetent Defendants Amendment Act of 2004. That Act contained a provision with language that is very similar to that of § 24-531.07(c). *See* D.C. Code § 24-501(a-1)(1) (2004 Supp.; repealed by D.C. Law 15-358, § 201(b) (52 D.C. Reg. 2015 (June 10, 2005))) ("[I]f . . . the court further determines that the person shall be released from further detention in the criminal . . . proceeding, the court shall remand the person to the hospital and the hospital may detain the person pending a hearing on the petition conducted pursuant to D.C. Official Code § 21-542."). The Committee Report for that bill also contains no mention of the idea that emergency involuntary hospitalization would be necessary to permit continued detention of defendants remanded to an inpatient facility pending a Commission hearing. *Prevention of Premature Release of Mentally Incompetent Defendants Amendment Act of 2004*, D.C. Council, Report on Bill 15-665 (July 8, 2004). The Report states that the bill was intended to "address a gap within the District's adult competency statute that could result in the release of a criminal defendant who has been found mentally incompetent to stand trial and ordered to be released from detention, but who may pose an imminent danger." *Id.*

at 1. The Report further stated that the bill "resolve[d] any ambiguity in the law and strengthen[ed] the District's ability to detain a mentally incompetent criminal defendant until a civil commitment proceeding can be concluded thereby protecting the public at large." *Id.* at 4.

Those general statements do not directly address the issue before us, but in our view they tend to undermine rather than support the idea that emergency involuntary hospitalization would be necessary to permit continued detention of defendants who are remanded to an inpatient facility under D.C. Code § 24-531.07(c)(1).

### D. Adequate Protection of Liberty Interests

Mr. Macklin argues that important liberty interests will be inadequately protected if defendants remanded to an inpatient facility pursuant to § 24-531.07(c)(1) can be detained based on the Commission's finding that inpatient commitment is the least restrictive alternative to prevent self-injury or injury to others. D.C. Code § 21-526(d). We disagree. The protections afforded to such defendants, though not precisely the same as those afforded to persons detained solely on the basis of emergency involuntary hospitalization, are ample.

First, defendants remanded to an inpatient facility pursuant to § 24-531.07(c)(1) have the right to a judicial determination, after a full evidentiary hearing held within twenty-fours of the request, as to whether there is probable cause they are "likely to injure [themselves] or others if not immediately detained." *In re Herman*, 619 A.2d at 959; D.C. Code § 24-531.07(c)(2); D.C. Code §§ 21-524 and -525. That finding is the proper "focus" of the judicial inquiry into the lawfulness of emergency involuntary hospitalization. *In re Herman*, 619 A.2d at 959. It is true that such defendants will not receive some of the antecedent protections provided to those who are being involuntarily hospitalized on an emergency basis, such as an examination by hospital officials before admission to the hospital. D.C. Code § 21-522. It is also true, however, that such defendants are not being seized without a warrant and brought to a hospital without prior judicial approval. Rather, they have been remanded to the hospital by a judge after a finding that they are not likely to regain competence. Moreover, a petition for civil commitment will already have been filed as to such defendants, and that petition would have to be supported by a certificate from a physician or qualified psychologist opining that the person is mentally ill and therefore likely to self-injure or injure others if not committed. D.C. Code §§ 21-541(a)(1), 24-531.07(c)(1).

Second, even if a defendant remanded to an inpatient facility under § 24-531.07(c)(1) chooses for some reason not to request a prompt judicial hearing, inpatient commitment without any further finding can continue only to the point of the Commission hearing. D.C. Code § 24-531.07(c)(1). At that point, inpatient commitment may continue only if the Commission finds that inpatient commitment is the least restrictive alternative to prevent self-injury or injury to others. D.C. Code § 21-526(d). It is true that the Commission is not required to make an explicit finding about the immediacy of the danger. At least arguably, however, some component of immediacy is reflected in the requirement that inpatient commitment is the least restrictive alternative. Moreover, a defendant who wishes to contest an issue of immediacy has the option of doing so by promptly requesting a judicial determination of the issue.

Finally, we note that Mr. Macklin may overstate the protection provided under the approach he advocates. Consider the following scenario: (1) a defendant is remanded to an inpatient facility, pursuant to § 24-531.07(c)(1); (2) the defendant is kept in that facility up to the date of the Commission hearing, pursuant to the same provision; (3) on the day of the hearing, the defendant is admitted to a hospital for emergency observation and diagnosis, pursuant to D.C. Code § 21-522; and (4) the Commission then finds that inpatient commitment is the least restrictive alternative

to prevent injury to self or others, pursuant to D.C. Code § 21-526(d). Under the plain language of § 21-526(d), the Commission can then order the "continued" "detention for emergency observation and diagnosis" until the completion of the civil-commitment process. That appears to be true even if no petition for continued emergency involuntary hospitalization has yet been filed with the court pursuant to D.C. Code § 21-523.

### E. Response to the Dissent

Our reasoning differs from that of the dissent in two principal respects. First, we disagree with the dissent's interpretation of the plain language of D.C. Code § 24-531.07(c)(2) and D.C. Code §§ 21-524 and -525. As we explain more fully *supra* at 13-17, § 24-531.07(c)(2) provides for a hearing to determine whether a defendant's detention can be "continued . . . pursuant to § 21-525." Section 21-525 provides for a hearing to determine whether the trial court's earlier ruling under § 21-524 was correct. *In re Herman*, 619 A.2d at 964. The issue for the trial court under § 21-524 is whether to grant "a petition for hospitalization of a person for emergency observation and diagnosis." D.C. Code § 21-524(a). Under the logic of Mr. Macklin's view (and that of the dissent), the plain language of the Ervin Act would therefore preclude a trial judge from ordering any detention whatsoever under

§ 24-531.07(c)(2) unless a defendant had already been hospitalized on an emergency basis, because in the absence of such emergency hospitalization there is no basis for "emergency observation and diagnosis." In our view, the dissent's contrary analysis does not adequately address the plain language of the provisions. The dissent takes the view that the words "pursuant to § 21-525" in § 24-531.07(c)(2) do not actually mean that the requirements of § 21-525 (which in turn refer to the requirements of § 21-524) have to be met in order for a defendant to be detained. *Post* at 49-50. We see no adequate basis for that view, which seems contrary to the plain language of the provisions.

Second, the dissent expresses uncertainty about the precise nature of our holding. *Post* at 55-56. To summarize, for the reasons we have stated, we construe the IDCCA and the Ervin Act to permit the continued detention of defendants who have been found unlikely to regain competence and who have been detained under D.C. Code § 24-531.07(c)(1), even if the defendant has not been hospitalized on an emergency basis, as long as the requisite findings under D.C. Code § 24-531.07(c)(2) (and thus D.C. Code §§ 21-524 and -525) or D.C. Code § 21-526(d) have been made. Specifically, although some language in those provisions considered in isolation indicates that such detention would be permissible only if the defendant had already been hospitalized on an emergency basis, we

conclude that the drafters of the IDCCA overlooked that language and that it would be absurd to treat that language as precluding continued detention.

## F. Conclusion

In sum, we hold that defendants remanded to an inpatient facility pursuant to § 24-531.07(c)(1) can be detained pending the completion of civil-commitment proceedings if the Commission finds that inpatient commitment is the least restrictive alternative to prevent self-injury or injury to others. D.C. Code §§ 21-542, -526(d). We note that the Commission in this case did not make an explicit finding that inpatient commitment was the least restrictive alternative. Mr. Macklin has not raised that issue in this appeal, however. For that reason, and because the order at issue in this case no longer has any practical effect, we do not reach the issue.

For the foregoing reasons, we reverse the judgment of the Superior Court.

*So ordered.*

EASTERLY, *Associate Judge*, dissenting in part: Wendell Macklin, charged with two misdemeanors, was detained pretrial after he missed several hearings in his criminal case. The temporary detention to ensure his appearance for his criminal trial morphed and extended when his counsel raised competency concerns and Mr. Macklin was sent to St. Elizabeths Hospital.[1] Eventually, the criminal court determined, pursuant to *Jackson v. Indiana*, 406 U.S. 715, 738 (1972), that Mr. Macklin was incompetent to stand trial for the foreseeable future and thus could no longer be held as a pretrial detainee; i.e., he was "*Jackson*'ed."

Thereafter, the District filed a petition to civilly commit Mr. Macklin via the standard process laid out in subchapter IV of the Ervin Act. Ordinarily, an individual subject to a civil commitment petition remains at liberty until the family court decides that civil commitment is warranted—unless separate emergency hospitalization procedures are pursued under subchapter III of the Ervin Act and a showing is made that an individual is mentally ill and due to that illness presents an immediate danger to themselves or others if not detained. The District never sought

---

[1] Competence is an individual's "present ability to consult with [their] lawyer with a reasonable degree of rational understanding" and their "rational, as well as . . . factual, understanding of the proceedings against [them]." D.C. Code § 24-531.01(1).

to make such a showing as to Mr. Macklin or request his emergency hospitalization under subchapter III.

The Incompetent Defendants Criminal Commitment Act ("IDCCA") provides a separate framework for immediate, temporary involuntary hospitalization: it allows a *Jackson*'ed defendant to be held either by the criminal court until the family court's ruling on civil commitment—or, if the criminal court orders the release of the individual from its custody and remands the individual to an inpatient treatment facility, by that facility "pending" a hearing before the Commission on Mental Health regarding the civil commitment petition, which results in a nonactionable recommendation. *See* D.C. Code § 24-531.07(c)(1). By the time the criminal court relinquished Mr. Macklin from its custody and remanded him to St. Elizabeths, however, he had already had his Commission hearing on the District's civil commitment petition. Thus, as the District acknowledges in its brief to this court, any authority under the IDCCA to hold Mr. Macklin had expired.

At this point, Mr. Macklin continued to be held seemingly without authority. When he challenged his involuntary hospitalization, the District contended that, once the authority to hold him under the IDCCA ended, he could be held under the emergency hospitalization provisions of subchapter III of the Ervin Act, specifically

§ 21-526(d)(1), even though the District had not initiated emergency hospitalization procedures and no determination had been made that he posed an immediate danger if not detained. The family court correctly rejected this argument and we should affirm its ruling.[2]

Subsection 21-526(d)(1) authorizes "continued" "detention for emergency observation and diagnosis . . . [p]ending the conclusion of judicial [commitment] proceedings." It plainly does not apply to Mr. Macklin because he was not detained "for emergency observation and diagnosis" under subchapter III of the Ervin Act to begin with. Rather, Mr. Macklin was held under a completely different statute that makes no mention of § 21-526(d)(1): the IDCCA. Under § 24-531.07(c)(1) of the IDCCA, *Jackson*'ed defendants like Mr. Macklin, who are the subject of a civil commitment petition and released from criminal court custody, may be held only "pending" a Commission hearing—an interim step in, not the conclusion of, a civil commitment proceeding. Subsection 24-531.07(c)(2) further limits detention authority under § 24-531.07(c)(1) by giving people like Mr. Macklin the right to seek their release via a probable cause hearing even before a Commission hearing takes place. It confers this right by referencing subchapter III of the Ervin Act,

---

[2] I concur with my colleagues in the majority in concluding that we should not dismiss this case as moot and instead resolve it on the merits. *See ante* Part II.

§ 21-525. But the whole of § 21-525, which affords such probable cause hearings specifically to emergency detainees under a different timetable, does not apply to *Jackson*'ed detainees so as to constrain the right to a probable cause hearing that § 24-531.07(c)(2) confers; nor does it logically compel treating *Jackson*'ed defendants like Mr. Macklin as emergency detainees.

Sections 21-526(d) and 24-531.07(c) have plain-language meanings that support Mr. Macklin. But my colleagues in the majority decline to accept them. My colleagues instead set forth a statutory scheme where a *Jackson*'ed defendant who is released from criminal custody can be involuntarily hospitalized as if the defendant were an emergency detainee until a court decides whether that defendant should be civilly committed. Rather than articulate an affirmative analysis of the statutes supporting their position, my colleagues focus on a perceived illogic in the text of § 24-531.07(c)(2) that is in fact a product of their misinterpretation of the plain language. They then discern a "drafting error" that they assert authorizes them to effectively rewrite the Ervin Act and the IDCCA. They elide the distinction between *Jackson*'ed defendants and emergency detainees and enlarge the District's detention authority in civil commitment proceedings. In so doing, they disregard the Ervin Act's animating objectives: to allow individuals who are subject to civil commitment petitions to remain at liberty unless and until a court issues a final

commitment order; to strictly limit emergency hospitalization to those situations in which an individual presents an immediate danger to themselves or others; and to impose a comprehensive quilt of procedural protections to ensure these aims are met.

I would read §§ 21-526(d) and 24-531.07(c) as they are written and, if that results in outcomes the legislature deems undesirable, allow the legislature to make any fixes it deems necessary. Accordingly, I would affirm the family court's determination that, upon the expiration of detention authority under the IDCCA and in the absence of the initiation of emergency hospitalization proceedings under subchapter III of the Ervin Act, Mr. Macklin was entitled to release. I therefore dissent.

## I. A Plain-Language Reading of the Statutes[3]

The Ervin Act and the IDCCA and are two separate statutory frameworks, enacted at two different times. While they relate in limited ways, I cannot agree with the majority opinion's conclusion that the "clear intent" of these provisions, *ante* at

---

[3] To aid the reader in this plain-language reading, I have reproduced the relevant statutory provisions in Appendix A, Excerpts from Subchapter III of the Ervin Act; Appendix B, Excerpts from Subchapter IV of the Ervin Act; and Appendix C, Excerpts from the Incompetent Defendants Criminal Commitment Act.

17, is to authorize the detention of a *Jackson*'ed defendant like Mr. Macklin, who has been released from criminal custody and has never been determined to be immediately dangerous, as an emergency detainee. Ordinarily, "the intent of the lawmaker is to be found in the language he [or she] has used." *Tippett v. Daly*, 10 A.3d 1123, 1126 (D.C. 2010) (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)). Here, the text of the Ervin Act and the IDCCA—which my colleagues in the majority concede provides "considerable support" for Mr. Macklin's position, *ante* at 12—is clear and controlling.

### A.    The Ervin Act

Enacted in 1965, the District of Columbia Hospitalization of the Mentally Ill Act (the "Ervin Act"), D.C. Code § 21-501 et seq., provides for both involuntary civil commitment and temporary emergency hospitalization when an individual may be a danger to themself or others. It sets out "a comprehensive statutory scheme" to balance two competing concerns: the constitutional rights of people with mental illnesses, and public safety (recognizing that people with mental illnesses are members of the public and may need protection from themselves). *See In re DeLoatch*, 532 A.2d 1343, 1345 (D.C. 1987) (per curiam) (internal quotation marks

omitted). Thus, while the Act provides for the involuntary civil commitment of a mentally ill individual in some circumstances, we have held that "the very core of the Act is an explicit and expedited timetable" for determining whether commitment is necessary, "at the conclusion of which the patient is either released or committed." *In re Lomax*, 386 A.2d 1185, 1188 (D.C. 1978) (en banc). More precisely, one might say that the core of the Act is *two* interlocking "explicit and expedited" timetables. One timetable, set forth in subchapter IV, §§ 21-541 to -551, applies when determining whether a person may be involuntarily civilly committed (for no more than a year at a time) because they are "mentally ill, and because of the illness[, are at some point in the future] likely to injure [themselves] or other persons if not committed." D.C. Code § 21-541(a)(1); *see also id.* § 21-545(b)(2). The other timetable, set forth in subchapter III, §§ 21-521 to -528, applies when determining whether a person may be temporarily involuntarily hospitalized on an emergency basis because there is "reason to believe that [the] person is mentally ill and, because of the illness, is likely to injure [themselves] or others if . . . not *immediately* detained." *Id.* § 21-521 (emphasis added).

In the context of civil commitments governed by subchapter IV, the Mental Health Commission makes recommendations about the need to commit an individual, but those recommendations have no immediate effect. Only the family

court can make the final determination that civil commitment is needed and order that individual be deprived of their liberty. *See id.* § 21-544 (directing the Commission to report its recommendation to the family court); *see also In re Reed*, 571 A.2d 801, 803 n.6 (D.C. 1990) (acknowledging that, even if the Commission recommends judicial commitment at the § 21-542 hearing, an "individual remains at liberty during the course of the [judicial] proceedings"); *In re Holmes*, 422 A.2d 969, 971 (D.C. 1980) ("The purpose of Commission proceedings is not to adjudicate the issue of commitment in a final manner."). The only exception to this rule is if the person is hospitalized on an emergency basis pursuant to subchapter III.

Subchapter III of the Ervin Act, titled "Emergency Hospitalization," authorizes the involuntary hospitalization of an individual before the family court has issued a final civil commitment order in the case of "certified emergenc[ies]." *Lomax*, 386 A.2d at 1188 n.13. Emergency hospitalization may be initiated only by a subset of those individuals qualified to initiate civil commitment under subchapter IV. *Compare* D.C. Code § 21-521 (listing officers of the Department of Mental Health, officers qualified to make arrests, or particular doctors), *with id.* § 21-541(a) (adding spouses, parents, and legal guardians to the list). As the majority opinion sets out, the initiation of emergency hospitalization "triggers a series of procedural protections" that, precisely because of the immediate loss of liberty, involves

timetables stricter than those governing civil commitment proceedings under subchapter IV. *Ante* at 7-9.

Subchapter III creates a limited exception to the default rule that an "individual remains at liberty during the course of [judicial commitment] proceedings," *Reed*, 571 A.2d at 803 n.6, and it "evinces the intention of Congress to permit emergency confinement for only short and precisely circumscribed durations," *DeLoatch*, 532 A.2d at 1345; *see also In re Herman*, 619 A.2d 958, 964-66 (D.C. 1993) (expressing our concern "that provision for emergency hospitalization can create a potential for erroneous commitments and unlawful detention" and noting that emergency hospitalization under the Ervin Act is subject to "strict time limits" that "provide a second tier of protections against extended deprivations of liberty"); *Lomax*, 386 A.2d at 1188 (explaining that "[t]ime periods from 24 to 48 hours are specified for emergency hospitalization, detention without court order, and court review and determination of the need for further hospitalization, which is in turn limited").

## B.    The IDCCA and Detention of Incompetent Defendants

The other statutory scheme that allows the immediate detention of individuals

in the District who are believed to be mentally ill is the Incompetent Defendants Criminal Commitment Act, D.C. Code § 24-531.01 et seq., which was enacted 40 years after the Ervin Act, in 2005. But the IDCCA was born of different concerns and employs a different framework than the Ervin Act.

Under the Fifth and Fourteenth Amendments of the U.S. Constitution, an individual deemed "incompetent" to stand trial may not be prosecuted. *Hargraves v. United States*, 62 A.3d 107, 111 (D.C. 2013) (citing *Medina v. California*, 505 U.S. 437, 453 (1992)); *see also* U.S. Const. amends. V, XIV; D.C. Code § 24-531.02(a). As defined by the IDCCA, see *supra* note 1, competence has nothing to do with dangerousness and thus has no direct relationship to the standards for civil commitment or emergency hospitalization under subchapters III and IV of the Ervin Act. In addition to the provisions of the IDCCA that set forth procedures for determining whether an individual is competent and for restoring competency where possible (during which time the individual may be in the community[4]), the IDCCA also addresses the criminal and family courts' authority to retain custody over a defendant who has been found incompetent and unlikely to regain

---

[4] *See* §§ 24-531.03 to .04 (allowing the criminal court to order inpatient or outpatient evaluations); *id.* § 24-531.05 (allowing the criminal court to order inpatient or outpatient "treatment for restoration of competency").

competency in the foreseeable future—called a "*Jackson*" finding pursuant to the Supreme Court's decision in *Jackson v. Indiana*, 406 U.S. 715 (1972).

In *Jackson*, the Supreme Court held that there are due process limitations on how long a criminal court may hold an incompetent defendant prior to trial while waiting to see if the defendant will become competent, and that once a criminal court makes a finding that someone will not become competent, "the State must either institute the customary civil commitment proceeding that would be required to commit . . . any . . . citizen, or release the[m]."[5] *Id.* at 738. In line with this mandate, the IDCCA acknowledges that releasing a defendant may be the appropriate outcome after a *Jackson* finding. D.C. Code § 24-531.06(c)(4) (allowing for release); *id.* § 24-531.07(a)(1) (requiring release if a civil commitment petition has not been filed within the statutory timeframe). As the majority opinion describes, it also includes a number of circumstances under which a *Jackson*'ed defendant may continue to be held, either by the criminal court or an inpatient treatment facility, pending evaluation of a defendant's dangerousness for the purposes of civil

---

[5] The Court also held that indefinitely institutionalizing an incompetent criminal defendant using "a more lenient commitment standard" than that applied "to all others [facing civil commitment but] not charged with [criminal] offenses" violates the Equal Protection Clause. *Jackson*, 406 U.S. at 730.

commitment. *See ante* at 9-10.[6]

Here, the provision of the IDCCA of central interest is D.C. Code § 24-531.07(c). Subsection (c)(1) provides that, if the criminal court "orders the release of a [*Jackson*'ed defendant] in the criminal case . . . and a petition for civil commitment has been filed" under subchapter IV of the Ervin Act, then "the court shall remand [that] person to the inpatient treatment facility" and that facility "may detain the person *pending a hearing* [by the Mental Health Commission] on the petition conducted pursuant to" subchapter IV. D.C. Code § 24-531.07(c)(1) (emphasis added). If the person is detained under subsection (c)(1) pending a hearing on their civil commitment petition, then they have a time-limited right (within seven days of remand) under subsection (c)(2) to seek "a probable cause hearing on [their] continued detention" in family court, "pursuant to § 21-525" of subchapter III of the Ervin Act. *Id.* § 24-531.07(c)(2). By its plain text, subsection (c)(2) imports the "probable cause" inquiry this court has held is required under

---

[6] Among these circumstances, D.C. Code § 24-531.07(a)(2) permits criminal courts to hold *Jackson*'ed defendants until the family court rules on their civil commitment if such proceedings are pending. Mr. Macklin expresses skepticism that this provision is consistent with the constitutional mandate of *Jackson*. I agree that the majority opinion need not address that question in this case, but if it avoids this question, it should not treat D.C. Code § 24-531.07(a)(2) as a foundation for its analysis. *But see ante* at 19-20.

§ 21-525. *See Herman*, 619 A.2d at 959 (explaining that the hearing provided under § 21-525 is one to assess "the present mental condition of the person involved and whether or not probable cause exists to believe that person is likely to injure himself or herself or others if not immediately detained"); *see also ante* at 24 (stating that "defendants remanded to an inpatient facility pursuant to § 24-531.07(c)(1) have the right to a judicial determination" under the *Herman* standard).  If the criminal court operating under § 24-531.07(c)(2) concludes that the requisite probable cause does not exist, then there is no longer any statutory authority for the *Jackson'*ed defendant to be held pending their Commission hearing and they are restored their presumptive right to liberty, enjoyed by any other person in civil commitment proceedings.  *See Reed*, 571 A.2d at 803 n.6.  If the requisite probable cause is discerned—or if, as in this case, a probable cause hearing under (c)(2) is never sought—a *Jackson'*ed defendant may be held for the duration authorized under (c)(1), which is until the Commission hearing.

## C.    Reading the IDCCA and Ervin Act Together, the Family Court Was Correct

Under the plain-language reading of the IDCCA and the Ervin Act, the family court was correct to order Mr. Macklin be released in the absence of any statutory

authority to involuntarily hospitalize him (1) under the Ervin Act as an emergency detainee or (2) under the IDCCA after his Commission hearing.

Manifestly, neither the Ervin Act nor the IDCCA provides the District the authority to detain a *Jackson*'ed defendant as an emergency detainee under D.C. Code § 21-526(d)(1) or more generally under any other provision of subchapter III of the Ervin Act. The Ervin Act, and subchapter III in particular, does not say anything about *Jackson*'ed defendants—unsurprisingly, since this legislation was enacted before the Supreme Court decided *Jackson*. And, although the IDCCA confers some authority outside the Ervin Act to involuntarily hospitalize a *Jackson*'ed defendant, that authority is limited and not tied to a defendant's status (or not) as an emergency detainee:

- A *Jackson*'ed defendant may be placed in extended inpatient treatment by the criminal court for a limited time (30 days with the possibility of a five-day extension) to permit the District to file a civil commitment petition. D.C. Code § 24-531.07(a). If the District does not file such a petition, the *Jackson*'ed defendant must be released from criminal custody; they cannot be automatically held as an emergency detainee. *Id.* § 24-531.07(a)(1).

- If the District files a civil commitment petition *and* the criminal court retains custody of the defendant (but query under *Jackson* how long the criminal court may lawfully do so, see *supra* note 5), the IDCCA authorizes continued detention of a *Jackson*'ed defendant until a judicial ruling on civil commitment, but the defendant is held under the IDCCA, not as an emergency detainee. *Id.* § 24-531.07(a)(2).

- If the District files a civil commitment petition but the court determines that continued criminal custody is not merited, the *Jackson*'ed defendant is remanded for continued inpatient detention only "pending [their Commission] hearing" (which should be held promptly, *see id.* § 21-542(a)), again not as an emergency detainee. *Id.* § 24-531.07(c)(1).

- And while that hearing is pending, the *Jackson*'ed defendant may challenge their continued inpatient detention before the court, prompting the same probable cause assessment to which emergency detainees are entitled under § 21-525. *Id.* § 24-531.07(c)(2). That said, the whole of § 21-525 does not apply to the *Jackson*'ed defendant. The

§ 21-525 allowance of a hearing upon request does not override and defeat the seven-day limit under § 24-531.07(c)(2) to request a § 21-525-type probable cause hearing. Likewise, the requirement under § 21-525 that the individual seeking a hearing be held pursuant to § 21-524 does not override and defeat the express directive under § 24-531.07(c)(2) that a *Jackson*'ed defendant who has been released from criminal custody and remanded to an inpatient treatment facility pending a Commission hearing, by virtue of their status as such an individual, is entitled to a § 21-525-type probable cause hearing. See *supra*.

The bottom line is that the IDCCA confers authority to continue to hold a *Jackson*'ed defendant under precisely defined procedural circumstances separate and apart from subchapter III of the Ervin Act; it does not provide a shortcut to an emergency hospitalization thereunder. And the IDCCA only allows involuntary hospitalization of a *Jackson*'ed defendant who has been released from criminal custody for a limited amount of time—at the outer boundary, up to the defendant's Commission hearing. Thereafter, like any other person in civil commitment proceedings, an individual who was a *Jackson*'ed defendant is presumptively permitted to be free in the community between the Commission hearing and the final

court order on their commitment. *See Reed*, 571 A.2d at 803 n.6. Thus, if the District wishes to detain a former criminal defendant beyond this time on an emergency basis, it must take the steps to initiate that process per subchapter III of the Ervin Act.[7]

My colleagues in the majority express concern that these two statutes operate awkwardly together in certain scenarios or require less than my colleagues' ideal expenditure of resources. But the text of these statutes is plain, and their commands are far from so absurd or unworkable that they require judicial revision. *Cf. Reed*, 571 A.2d at 803 n.6 (approving of a scheme wherein an involuntarily hospitalized person is released but subject to the institution of additional detention proceedings); see *infra* Section II.B (discussing the drafting-error doctrine). And if some other process is preferable as a matter of policy, then it is within the Council's exclusive

---

[7] The majority opinion asserts that Mr. Macklin "may overstate the protection provided under" his plain-language reading of the Ervin Act and the IDCCA, and then provides a hypothetical in which the District takes steps to pursue emergency detention of *Jackson*'ed defendant under subchapter III of the Ervin Act. *Ante* at 25-26. Regardless of whether the District, having initiated emergency detention and diagnosis under D.C. Code § 21-522, can seek continued detention under § 21-526(d) without complying with § 21-523—the hypothetical scenario presented—the point here is that the District did not seek emergency hospitalization of Mr. Macklin under subchapter III of the Ervin Act or ever obtain an assessment that he presented an immediate danger to himself or others. Consequently, this hypothetical offers little to detract from the merits of the plain-language reading in this case.

purview to amend the statutes accordingly. *Lamie v. United States Trustee*, 540 U.S. 526, 542 (2004) (stating that, if the legislature "enacted into law something different from what it intended, then it should amend the statute to conform it to its intent"; "[i]t is beyond our province to rescue [the Council] from its drafting errors, and to provide for what we might think is the preferred result" (ellipsis and internal quotation marks omitted)).

Moreover, a plain-language reading of the IDCCA and the Ervin Act that requires the District to initiate emergency detention procedures when it wishes to treat a former criminal defendant as an emergency detainee respects the broader aims of the Ervin Act to protect the rights of people with mental illnesses.[8]  *Reed*, 571 A.2d at 802.  This court is obligated to construe the Act's provisions "narrowly, even grudgingly," given the "drastic curtailment" of a person's liberty that may result from its application.  *Lomax*, 386 A.2d at 1187-88 (noting that the Act was "designed with a view to securing at last the civil and constitutional rights" of "long-neglected" people with mental illnesses, and that it aims to ensure that "no one [is] hospitalized involuntarily for a prolonged period unless a judge or jury [finds] the patient to be

---

[8] Although the majority opinion announces it will "look to the legislative history" to aid its interpretation, *ante* at 11, it leaves out any consideration of the legislative history of the Ervin Act.

both mentally ill and likely to injure [themselves] or others"); *see also DeLoatch*, 532 A.2d at 1345 (observing that the Ervin Act reflects a "profound congressional concern for the liberties of [people with] mental[] ill[ness]" (internal quotation marks omitted)). If anything, the enforcement of demanding procedural protections is a desired feature of the Ervin Act, not an unwanted bug; this court has described the "explicit and expedited" timetables of the statute as its "very core." *Lomax*, 386 A.2d at 1188. We therefore should not be looking to expand the reach of the limited detention authority the Act permits, absent clear statutory indication this was intended.

## II.    The Majority Opinion's Analysis

The majority opinion clearly disagrees with the conclusion I draw above, but little else of its interpretive work is rendered with the same clarity. As a result, it is difficult to discern the foundations for the majority opinion's conclusion that Mr. Macklin could be held under D.C. Code § 21-526(d) after the power to hold him under D.C. Code § 24-531.07(c)(1) had expired. But it is clear my colleagues in the majority do not rely on the plain text of these statutes.

## A.    Lack of Statutory Foundation

My colleagues in the majority conclude that *Jackson*'ed defendants like Mr. Macklin, who have been released from criminal custody and remanded to inpatient treatment, but can no longer be held under § 24-531.07(c) of the IDCCA, can "properly be detained pursuant to . . . § 21-526(d)" of subchapter III of the Ervin Act, *ante* at 11-12, which permits the extension of a person's "detention for emergency observation and diagnosis." They do not attempt to reach this conclusion by walking through the plain language. They could not, given that nothing in the IDCCA incorporates § 21-526(d) into its operation, nor does any part of the IDCCA contemplate "detention for emergency observation and diagnosis" under the Ervin Act. The plain language notwithstanding, the majority opinion determines that it would be absurd for the IDCCA not to allow continued detention of a *Jackson*'ed defendant like Mr. Macklin under § 21-526(d).

The majority opinion's perceived "absurdity" rests entirely on the reference in § 24-531.07(c)(2) of the IDCCA to § 21-525 of the Ervin Act. *Ante* at 13-16. The majority opinion asserts that, since § 24-531.07(c)(2) provides for a hearing "pursuant to § 21-525," under "the logic of Mr. Macklin's argument" a criminal court "could not order 'continued detention' under § 24-531.07(c)(2) unless the

District of Columbia had already filed a petition for emergency involuntary hospitalization" per the Ervin Act. *Ante* at 13. It then argues that "[l]imiting the trial court's authority to order continued detention under § 24-531.07(c)(2) to cases in which a petition for emergency involuntary hospitalization has already been filed would lead to consequences that we view as unreasonable to the point of absurdity." *Ante* at 15. But the logical fallacy the majority opinion perceives is a product of its own unreasonable interpretation of § 24-531.07(c)(2)'s reference to § 21-525.

The majority opinion reads § 24-531.07(c)(2)'s reference to § 21-525 as imposing all the requirements of § 21-525 on a *Jackson*'ed defendant, in particular, the requirement that the person requesting the hearing be one "whose continued hospitalization is ordered under section 21-524," i.e., someone who has already been hospitalized on an emergency basis. That is an unreasonable reading of the text. The reference to § 21-525 cannot import the entirety of that provision, given the incompatibilities noted *supra* Section I.C, including § 21-525's restrictions on who gets a "probable cause hearing" (only emergency detainees). Instead, as explained *supra* Sections I.B & C, the reference to a "probable cause hearing" under § 21-525 in § 24-531.07(c)(2) gives *Jackson*'ed defendants detained under (c)(1) (who are not emergency detainees) a time-limited right to the same "probable cause" type inquiry

required under this court's decision in *Herman*.[9]  *See* 619 A.2d at 959.  The plain text compels this understanding.  But even if the majority opinion disagrees that this is the only way to read the language of (c)(2), at the very least the statutory language can be reasonably read in this manner, and the existence of a reasonable interpretation of the statute precludes any absurdity analysis.  *See Wright v. United States*, 315 A.2d 839, 841 (D.C. 1974) (stating that "absurdity is a result courts should view with disfavor" unless "a statute fairly leaves no room for construction to avoid such a result").  *But see ante* at 17-18.

The majority opinion's perceived logical fallacy in the operation of § 24-531.07(c)(2) and § 21-525 is not only without basis, it is a distraction.  Mr. Macklin's argument is that the District's detention authority ended following his Commission hearing under § 24-531.07(c)(1).  He does not argue that interpreting § 24-531.07(c)(2) is necessary to his claims at all.  Indeed, he never had a subsection

---

[9] Later, the majority opinion asserts that the purpose of a subsection (c)(2) hearing is "to determine whether a defendant's detention can be 'continued . . . pursuant to § 21-525.'"  *Ante* at 26.  This is the closest the majority opinion gets to a plain-language analysis, but it abridges what (c)(2) says.  The "continued detention" referenced under (c)(2) refers back to the detention authorized under (c)(1).  D.C. Code § 24-531.07(c)(2) ("Within 7 days of the remand order, *a person so detained* [under (c)(1)] may request a probable cause hearing on the person's *continued detention* before the Family Court of the Superior Court of the District of Columbia pursuant to § 21-525, in which case a hearing shall be held within 24 hours after the receipt of the request."  (emphasis added)).

(c)(2) hearing during which a court could consider his "continued detention" under (c)(1). Moreover, the District has never argued that it had the authority to continue to detain Mr. Macklin under § 21-525, a fact not mentioned the majority opinion. The District argued that, after the authority to detain Mr. Macklin under § 24-531.07(c)(1) expired, it could continue to involuntarily hospitalize him under § 21-526(d). The majority opinion makes no argument as to that statutory provision, fallacious or otherwise; rather, it practically ignores it.

### B.   Misuse of the Drafting-Error Doctrine

Having derived a logical fallacy from a misreading of the plain text of § 24-531.07(c)(2), the majority opinion calls the implications of that fallacy "absurd" and then declares it has discovered a "drafting error" in the IDCCA. *Ante* at 18.[10]

---

[10] This too was not briefed by the parties. The government never argued that there was a drafting error in either the Ervin Act or the IDCCA. In its initial brief the government maintained that the plain text of the Ervin Act and the IDCCA *supported* its continued detention of Mr. Macklin after his Commission hearing. In its reply brief the government abandoned this argument and argued that these statutes were ambiguous and reasonably interpreted to support Mr. Macklin's continued detention.

At the outset, I note that it is far from clear that it is appropriate to locate a "drafting error" in one statutory scheme (the IDCCA) based on its assertedly awkward relationship to an entirely separate statutory scheme (the Ervin Act), enacted decades prior. The majority opinion cites no analogous examples. But such inter-statutory interactions are predictably complex and imperfect, implicating policy decisions best left to legislators. Even assuming that such a conclusion might be appropriate in some circumstances, however, the majority offers no foundation for its discernment of a drafting error in this case other than the apparently disfavored outcomes the pertinent statutes yield as written. *See ante* at 17-18, *see also id.* at 27-28.[11] This flies directly in the face of the drafting-error doctrine.

While courts on limited occasions and, in the majority's words, "in extraordinary circumstances," *ante* at 17, take it upon themselves to step in where there are clear errors introduced in the legislative drafting process, it is difficult to

---

[11] The majority opinion appears to consider "continued detention" of *Jackson*'ed defendants like Mr. Macklin—who have been released from criminal custody and remanded to inpatient treatment under (c)(1), but may no longer be held under that provision—to be the presumptive norm that must be rebutted. *See, e.g.*, *ante* at 28 (explaining that language it identifies as problematic under its logical fallacy argument, see *supra*, cannot reasonably be "treat[ed] . . . *as precluding continued detention*." (emphasis added)). But the presumptive norm is liberty, and language to authorize the deprivation of liberty must be found within the operative statutory language.

discern either the extraordinary circumstances or the clear error that would justify the majority's intervention. None of the potential "absurdities" that the majority identifies—strict timetables, rigorous due process, a requirement of diligence on the part of the District[12]—compare remotely to the obvious errors that courts have previously seen fit to correct. For example, this case is nothing like *Gilmore v. United States*, 699 A.2d 1130 (D.C. 1997), cited by the majority opinion *ante* at 18, where this court determined a definitional provision's use of the word "subsection" instead of "section" was an obvious "clerical error" that had the effect of making the definitional provision apply only to itself, rendering it "pointlessly circular." *Id. at* 1132; *see also id.* at 1132-33 (collecting cases including where, for example, there was a manifest "scrivener's error . . . made by someone unfamiliar with the law's object" (internal quotation marks omitted)). *Chickasaw Nation v. United States,* 534 U.S. 84 (2001), similarly lends no support to the majority opinion's invocation of this doctrine. In that case, the Supreme Court ignored one manifestly unrelated statutory provision in a list of cross-referenced statutes because "common sense

---

[12] Given that D.C. Code § 24-531.07(a) plainly places the burden on the District to, as an initial matter, timely file a civil commitment petition in order to continue to detain a *Jackson*'ed defendant, it is unclear why the majority opinion, *ante* at 15-16, finds it so implausible that the statute would similarly require the District to file an application for emergency hospitalization around the same time should it wish from the outset to have greater detention authority over that defendant; the District by necessity would already be aware of the defendant and their mental condition.

suggest[ed]" its inclusion was a "drafting mistake." *Id.* at 91.

Thus*,* in *Niz-Chavez v. Garland,* 141 S. Ct. 1474 (2021), the Court explained that this doctrine "applies only in exceptional circumstances to obvious technical drafting errors," which had no application in that case where the question was whether Congress intended a statute to be as procedurally demanding as its plain text indicated. *Id*. at 1480 n.1. Similarly in *Lamie v. United States Trustee*, 540 U.S. 526 (2004), the Supreme Court hewed to the plain language of the statute notwithstanding the fact that it led to "a harsh outcome" and explained that its "unwillingness to soften the import of Congress' chosen words" was grounded in "deference to the supremacy of the Legislature." *Id.* at 538 (internal quotation marks omitted). This court is likewise bound to defer to the statutory text as enacted by the Council and should not second-guess its policy objectives.

## C.     Rewriting the Statutes

Having thus expanded the drafting-error doctrine, the majority opinion announces that a *Jackson*'ed defendant who is released from criminal custody and can no longer be held under D.C. Code § 24-531.07(c) of the IDCCA can be involuntarily hospitalized as if they were an emergency detainee until a court decides

whether they should be civilly committed.  But where exactly is the "error" in the text that the majority purports to fix, and what exactly is the nature of that fix?

The majority opinion first puts forth that § 24-531.07(c)(2)'s "cross-reference to provisions [] § 21-524 and § 21-525 [] that by their terms seem to presuppose prior detention for emergency observation and diagnosis" is an "apparent drafting error." *Ante* at 17; *see also id.* at 27-28.  Because § 24-531.07(c)(2) does not actually refer to § 21-524, its reference to § 21-525 is left as the remaining possible error.  But if the majority aims to suggest that the Council meant to point to a different statutory provision, it does not say so or identify the intended referent.  And if the majority's solution is to excise the reference to § 21-525 from the IDCCA, then it also excises the basis on which it concludes that a § 24-531.07(c)(2) hearing provides the same protections as the provisions of the Ervin Act pertaining to emergency hospitalization, *ante* at 24.

The majority opinion next points to the "presupposition" in § 21-526(d) of the Ervin Act that a person must have been detained "for emergency observation and diagnosis" before the District may extend their detention through the conclusion of civil commitment proceedings, and concludes that this is "a drafting error that can and should appropriately be disregarded." *Ante* at 18; *see also id.* at 27-28.  But the

majority opinion cannot possibly mean that, in enacting the IDCCA, the Council wrote a "drafting error" into the Ervin Act enacted 40 years earlier, thereby permitting this court to simply strike out language from § 21-526(d). And, as already stated, the IDCCA makes no mention of § 21-526 that might be "disregarded."

As a third alternative, the majority opinion implies that it was a "drafting error" for the Council to provide in § 24-531.07(c)(1) for detention "pending a hearing on the petition conducted pursuant to § 21-542" when it meant to write "pending the completion of civil-commitment proceedings if the Commission finds that inpatient commitment is the least restrictive alternative to prevent self-injury or injury to others." *Ante* at 28. But that difference is much more than a slip of the pen or a transposition error that this court might justifiably correct. Accordingly, the decision whether to make such an amendment should be reserved to the Council.

Ultimately, the majority opinion does not precisely identify the drafting error it is correcting. It simply asserts that "the drafters of the IDCCA overlooked" how all of the provisions discussed above interact. *Ante* at 28 (citing D.C. Code §§ 21-524, -525, -526(d) & 24-531.07(c)(1)&(2)). And thus it becomes clear: the majority opinion is not in fact correcting an identifiable textual error in the Ervin Act or the IDCCA. It is simply rewriting the law.

\* \* \*

The legislature, per § 24-531.07(c)(1) of the IDCCA, deemed it necessary to authorize the continued detention of former criminal defendants who have been *Jackson*'ed, released from criminal custody, and are the subject of civil commitment petitions, for a limited period of time—"pending" their ("prompt[]") Commission hearing. *Id.*, *see also* D.C. Code § 21-542(a). After this point, this group of former criminal defendants is statutorily restored to the liberty that all other individuals awaiting a final civil commitment order are presumed to enjoy unless a petition for emergency hospitalization is filed. This is hardly absurd. *Jackson*'ed defendants are not presumptively immediately dangerous, and, in the absence of a legitimate basis to hold them after the conclusion of their criminal cases, their eventual release is constitutionally demanded. In disregard of the plain language of the operative statutes, my colleagues in the majority hold that *Jackson*'ed defendants who can no longer be held under § 24-531.07(c)(1) of the IDCCA may be shunted into subchapter III of the Ervin Act so as to authorize their continued hospitalization under D.C. Code § 21-526(d) as emergency detainees (but without a determination that they are immediately dangerous). I disagree that they have the authority to effectively rewrite how the Ervin Act and the IDCCA should interact.

For these reasons, I respectfully dissent.

# APPENDIX A:

## Subchapter III of the Ervin Act, "Emergency Hospitalization" (excerpts)

**§ 21-521**. Detention of persons believed to be mentally ill; transportation and application to hospital.

An accredited officer or agent of the Department of Mental Health of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or a physician or qualified psychologist of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, or to the Department, and make application for his admission thereto for purposes of emergency observation and diagnosis. . . .

**§ 21-522**. Examination and admission to hospital; notice.

**(a)** Subject to the provisions of section 21-523, the administrator of a private hospital may, and the administrator of a public hospital or the chief clinical officer of the Department or his designee shall, admit and detain for purposes of emergency observation and diagnosis a person with respect to whom application is made under section 21-521, if the application is accompanied by a certificate of a psychiatrist, qualified physician, or qualified psychologist on duty at the hospital or the Department stating that he or she:

**(1)** Has examined the person;

**(2)** Is of the opinion that the person has symptoms of a mental illness and, because of the mental illness, is likely to injure himself or others unless the person is immediately detained; and

**(3)** Is of the opinion that hospitalization is the least restrictive form of treatment available to prevent the person from injuring himself or others.

. . .

**§ 21-523**. Court order requirement for hospital detention beyond 48 hours; maximum period for observation.

A person admitted to a hospital or the Department under section 21-522 may not be detained in the hospital or by the Department for a period in excess of 48 hours from the time of the person's admission, unless the administrator of the hospital, the chief clinical officer of the Department, or the administrator's or chief clinical officer's designee has, within that period, filed a written petition with the court for an order authorizing the continued detention of the person for emergency observation and diagnosis for a period not to exceed 7 days from the time the order is entered.

**§ 21-524**. Determination and order of court.

**(a)** Within a period of 24 hours after the court receives a petition for hospitalization of a person for emergency observation and diagnosis, filed by the administrator of a hospital or chief clinical officer of the Department pursuant to section 21-523, the court shall:

    **(1)** order the hospitalization; or

    **(2)** order the person's immediate release.

**(b)** The court, in making its determination under this section, shall consider the written reports of the agent, officer, physician or qualified psychologist who made the application under section 21-522, the certificate of the examining psychiatrist or examining qualified psychologist which accompanied it, and any other relevant information.

**§ 21-525**. Hearing by court.

    The court shall grant a hearing to a person whose continued hospitalization is ordered under section 21-524, if he requests the hearing. The hearing shall be held within 24 hours after receipt of the request.

**§ 21-526**. Extension of maximum periods of time.

. . .

**(c)** The maximum period of time for detention for emergency observation and diagnosis may be extended for up to 21 days, if judicial proceedings under subchapter IV of this chapter have been commenced before the expiration of the order entered under section 21-524 and a psychiatrist or qualified psychologist has examined the person who is the subject of the judicial proceedings and is of the opinion that the person being detained remains mentally ill and is likely to injure himself or others as a result of the illness unless the emergency detention is continued. For good cause shown, the Court may extend the period of detention for emergency observation and diagnosis. The period of detention for emergency observation and diagnosis may be extended pursuant to section 21-543(b) or following a hearing before the Commission pursuant to subsections (d) and (e) of this section.

**(d)** If the Commission, at the conclusion of its hearing pursuant to section 21-542 [reviewing a petition for civil commitment], has found that the person with respect to whom the hearing was held is mentally ill and, because of the mental illness, is likely to injure himself or others if not committed, and has concluded that a recommendation of inpatient commitment is the least restrictive alternative available to prevent the person from injuring himself or others, the detention for emergency observation and diagnosis may be continued by the Department or hospital —

    **(1)** Pending the conclusion of judicial proceedings under subchapter IV of this chapter [governing civil commitment];

    **(2)** Until the Court enters an order discharging the person; or

    **(3)** Until the Department or hospital determines that continued hospitalization is no longer the least restrictive form of treatment appropriate for the person being detained.

. . .

**APPENDIX B:**

**Subchapter IV of the Ervin Act, "Commitment Under Court Order"**
**(excerpts)**

**§ 21-541**. Petition to Commission; copy to person affected.

**(a)** Proceedings for the judicial commitment of a person in the District of Columbia may be commenced by the filing of a petition with the Commission by his spouse, parent, or legal guardian, by a physician or a qualified psychologist, by a duly accredited officer or agent of the Department, by the Director of the Department or the Director's designee, or by an officer authorized to make arrests in the District of Columbia. The petition shall be accompanied by:

     **(1)** a certificate of a physician or qualified psychologist stating that he has examined the person and is of the opinion that the person is mentally ill, and because of the illness is likely to injure himself or other persons if not committed

. . .

**§ 21-542**. Hearing by Commission; presence and rights of person affected; hearing regarding liability.

**(a)** The Commission shall promptly examine a person alleged to be mentally ill after the filing of a petition under section 21-541 and shall thereafter promptly hold a hearing on the issue of his mental illness. The hearing shall be conducted in a manner consistent with orderly procedure and in a physical setting not likely to have a harmful effect on the mental health of the person named in such petition. In conducting the hearing, the Commission shall hear testimony of any person whose testimony may be relevant and shall receive all relevant evidence which may be offered. A person with respect to whom a hearing is held under this section may, in his discretion, be present at the hearing, to testify, and to present and cross-examine witnesses.

. . .

**§ 21-544**. Determinations of Commission; report to court; copy to person affected; right to jury trial.

If the Commission finds, after a hearing under section 21-542, that the person with respect to whom the hearing was held is not mentally ill or if mentally ill, is not mentally ill to the extent that he is likely to injure himself or other persons if not committed, the Commission shall immediately order his release and notify the court of that fact in writing. If the Commission finds, after the hearing, that the person with respect to whom the hearing was held is mentally ill, and because of the illness is likely to injure himself or other persons if not committed, the Commission shall promptly report that fact, in writing, to the Superior Court of the District of Columbia. The report shall contain the Commission's findings of fact, conclusions of law, and recommendations. A copy of the report of the Commission shall be served personally on the person with respect to whom the hearing was held and his attorney. A person with respect to whom the hearing was held with respect to whom the report is made has the right to demand a jury trial, and the Commission, orally and in writing, shall advise him of this right.

**§ 21-545**. Hearing and determination by court or jury; order; witnesses; jurors.

**(a)** Upon the receipt by the court of a report referred to in section 21-544, the court shall promptly set the matter for hearing and shall cause a written notice of the time and place of the final hearing to be served personally upon the person with respect to whom the report was made and his attorney, together with notice that he has five days following the date on which he is so served within which to demand a jury trial or a trial by the Court. The demand may be made by the person or by anyone in his behalf. If a jury trial or a trial by the Court is demanded within the five-day period, it shall be accorded by the court with all reasonable speed. If a timely demand for jury trial or a trial by the Court is not made, the court shall determine the person's mental condition on the basis of the report of the Commission, or on such further evidence in addition to the report as the court requires.

**(b)**    **(1)** If the Court or jury finds that the person is not mentally ill or is not likely to injure himself or others as a result of mental illness, the Court shall dismiss the petition and order the person's release.

    **(2)** If the Court or jury finds that the person is mentally ill and, because of that mental illness, is likely to injure himself or others if not committed, the Court may order the person's commitment to the Department or to any other facility, hospital,

or mental health provider that the Court believes is the least restrictive alternative consistent with the best interests of the person and the public. An order of commitment issued pursuant to this paragraph shall be for a period of one year.

. . .

## APPENDIX C:

## The Incompetent Defendants Criminal Commitment Act (IDCCA) (excerpts)

§ 24-531.01. Definitions

For the purposes of this chapter, the term:

(1) "Competence" means that a defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and has a rational, as well as a factual, understanding of the proceedings against him or her.

. . .

(5) "Incompetent" means that, as a result of a mental disease or defect, a defendant does not have sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding or does not have a rational, as well as a factual, understanding of the proceedings against him or her.

(6) "Inpatient treatment facility" means:

(A) Saint Elizabeths Hospital;

(B) Any other physically secure hospital for the examination or treatment of persons with mental illness; or

(C) Any physically secure or staff-secure facility for the examination, treatment, or habilitation of persons with intellectual disabilities.

. . .

(9) "Treatment" means the services or supports provided to persons with mental illness or intellectual disabilities, including services or supports that are offered or ordered to restore a person to competence, to assist a person in becoming competent, or to ensure that a person will be competent.

. . .

**§ 24-531.06**. Court hearings during and after treatment.

**(a)** The Court shall hold a prompt hearing, with reasonable notice of such hearing given to the prosecuting attorney, the defendant, and the defendant's attorney of record, and make a new finding as to the defendant's competence when:

> **(1)** Any period of treatment ordered under § 24-531.05(b), (c), or (e) is completed; or [other conditions are met that present the potential termination of the defendant's treatment]

. . .

**(c)**      **(1)** At the conclusion of a hearing held pursuant to subsection (a) of this section, the court shall:

> **(A)** Find that the defendant is competent; or

> **(B)** Find that the defendant is incompetent and:

>> **(i)** There is a substantial probability that the defendant will attain competence or make substantial progress toward that goal with an additional period of time; or

>> **(ii)** There is no substantial probability that he or she will attain competence or make substantial progress toward that goal in the foreseeable future.

. . .

> **(4)** If the court finds the defendant is incompetent pursuant to paragraph (1)(B)(ii) of this subsection, the court shall either order the release of the defendant or, where appropriate, enter an order for treatment pursuant to § 24-531.05(a) for up to 30 days pending the filing of a petition for civil commitment pursuant to subchapter IV of [the Ervin Act]. The court also may order treatment pursuant to § 24-531.07(a)(2) for such period as is necessary for the completion of the civil commitment proceedings.

**§ 24-531.07**. Extending treatment pending the completion of a civil commitment proceeding.

**(a)** Thirty days after the court has ordered extended treatment pursuant to § 24-531.06(c)(4), the court shall hold a status hearing to determine whether civil commitment proceedings have been initiated pursuant to § 21-541 [of subchapter IV of the Ervin Act] . . . .

    **(1)** If a petition for civil commitment has not been filed prior to the hearing, the court shall release the defendant from treatment unless extraordinary cause is shown for the failure to file the petition, in which case the court may grant an additional 5 days within which to file a petition.

    **(2)** If a petition for civil commitment has been filed, the court may either order that treatment be continued until the entry of a final order in the civil commitment case or release the defendant from treatment.

. . .

**(c)**    **(1)** If the court orders the release of a person in the criminal case or transfer proceeding who has been committed to an inpatient treatment facility, and a petition for civil commitment has been filed pursuant to § 21-541 [of subchapter IV of the Ervin Act], the court shall remand the person to the inpatient treatment facility and the inpatient treatment facility may detain the person pending a hearing on the [civil commitment] petition conducted [by the Commission] pursuant to § 21-542.

    **(2)** Within 7 days of the remand order, a person so detained may request a probable cause hearing on the person's continued detention before the Family Court of the Superior Court of the District of Columbia pursuant to § 21-525 [of subchapter III of the Ervin Act], in which case a hearing shall be held within 24 hours after the receipt of the request.

. . .